## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CIVIL NO. 1:19-CV-564** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **JOSEPH FORREST,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Collateral is the lifeblood of commerce. By pledging collateral borrowers and businesspeople can secure much needed cash flow financing that is essential to their endeavors. By accepting collateral to secure loans, leases and other financial transactions lenders and landlords can protect their investments and minimize their future financial risk in the event of default.

Given the crucial role of collateral in the modern marketplace, it is unsurprising that oftentimes creditors may believe that the same collateral secures multiple loans or leases. When this occurs, in order to avoid economic chaos in the event that competing creditors attempt to execute on the same piece of property the law prescribes a series of rules setting priorities between creditors.

1

In broad terms, these rules look to three principles when deciding which creditors may first execute on some asset in the event of a default. First, the law sets priorities based upon timeliness. Thus, oftentimes the creditor who is first in time is also first in right when it comes to collecting on collateral. Second, this tenet of timeliness is tempered by notions of notice. Therefore, in order for a creditor to assert the rights of a preferred position due to the timing of transactions, that creditor must have also perfected its security interest and recorded its lien in a fashion which put others on fair notice of its preferred position. Finally, these concepts of timeliness and notice on occasion are required by law to give way to the rights of certain classes of creditors who are given a priority over others by virtue of the particular nature of their business relationship with the defaulting debtors.

Occasionally, competing creditors become embroiled in controversies regarding the priority of their claims as they each pursue their individual parochial self-interest in making financial recoveries when a debtor's dreams collapse and there is a default which permits several lenders to execute on the same collateral. So it is here. This is an action for conversion of collateral brought by the U.S. Department of Agriculture (USDA), an agricultural lender, against Jospeh Forrest, a farmer who leased farmlands to a third party who subsequently defaulted both on the USDA loan and on his lease. It is

asserted that the loan and lease were both collateralized, in part, through grain being grown on the property. At the time of these defaults, Mr. Forrest, as landlord, took over possession of the leased estate, harvested some of the crops and retained the proceeds of that harvest. Citing what it believes to have been its superior lien position, the USDA now alleges that Forrest's actions constituted conversion of its collateral and sues to recover these proceeds. For his part, Mr. Forrest—who is now representing himself—insists that he acted within his legal rights when he executed upon this collateral, asserting that as a landlord he held a superior lien position on this grain.

Thus, the instant case, which comes before us on a motion for summary judgment filed by USDA, (Doc. 104), invites us to navigate the legal principles which govern priorities of liens in a commercial agricultural setting. Therefore, we must apply the provisions of the Uniform Commercial Code, as adopted in Pennsylvania, to the dispute regarding lien priorities while also foraying into the arcane intricacies of Pennsylvania landlord-tenant law. Having embarked on this course, for the reasons set forth below the plaintiff's motion for summary judgment will be granted as follows: We will enter summary judgment in favor of the plaintiff on its conversion claim in the amount of $24,468.49.

II.    **Procedural History and Factual Background**

A. **Procedural History**

We pause at the outset to address the protracted and somewhat tortured procedural history of this case. On April 1, 2019, the United States commenced this lawsuit against Mr. Forrest, an elderly farmer, seeking to recover the value of crops allegedly sold by Forrest which had been the subject of a Department of Agriculture lien. According to the complaint, Forrest disposed of these crops without compensating the government for the value of this collateral which secured its loans. (Doc. 1).

Forrest was served with this complaint and was initially represented by counsel in this case. Following protracted proceedings marked by a series of alleged discovery defaults by Forrest, on March 17, 2021, the United States moved for entry of a default judgment. (Doc. 41). A hearing was held on this motion on December 9, 2021. At the time of this hearing, Forrest's counsel allegedly informed the court that his client was aware of the scheduled hearing and offered no opposition to the default motion. (Doc. 45). Accordingly, on February 16, 2022, default judgment was entered in favor of the government in the amount of $35,126.65, plus post-judgment interest. (Doc. 52).

This case, which had seemingly drawn to a close in 2022, was revived in March of 2023, when Forrest, who was now proceeding *pro se*, filed a

4

motion to set aside this default judgment. (Doc. 60). In this motion Forrest advanced what we found to be a substantial claim of attorney abandonment by his previous counsel. After this case was reassigned to this court, we addressed this pending motion. Recognizing that the law strongly favors merits resolution of lawsuit, and acknowledging that Forrest's claims had some substance, we set aside the default judgment, and prescribed a course of litigation that would enable the parties to resolve this dispute on its merits. (Docs. 72-85).

At the completion of a somewhat contentious and halting course of discovery, the USDA has now filed a motion for summary judgment, (Doc. 104), which contends that it is entitled to judgment as a matter of law on its conversion claim because it undisputedly held a priority lien possession with respect to the corps harvested and sold by Forrest. This motion is now fully briefed, (Docs. 104-118), and is, therefore, ripe for resolution.

### B. **Factual Background**

The factual background of this case is a product of a triangular business relationship. Simply put, the current dispute between the USDA and Forrest is a function of their separate business relations with James Weller, a tenant farmer who leased land from Forrest and borrowed money from the USDA. When Weller defaulted on both the lease and the loan he set the stage of this

contest between the parties regarding the relative priorities of their liens. As to this issue, the essential undisputed facts[1] are as follows:

### 1. Weller's Business Relationship With the USDA

In July of 2008, James Weller borrowed the sum of $185,000.00 from the United States Department of Agriculture, (USDA) Farm Service Agency (FSA), as an operating loan for his farming business.  At that time Weller executed a security agreement in favor of the United States. Under the terms of this security agreement, the USDA possessed a security interest in certain collateral belonging to, or later acquired by, Weller including crops, farming equipment, livestock, and farm-related accounts, contracts, and the like.  At the time of this transaction, the USDA filed an initial UCC financing statement, No. 2008060901101, identifying Weller as the debtor and securing the following types of collateral: all accounts, general intangibles, crops, livestock, supplies, other farm products, and farm and other equipment now owned or acquired hereafter. By its terms this UCC Financing Statement provided that the disposition of this collateral was not authorized.

Between 2009 and 2015, Weller, and his spouse executed various rescheduled promissory notes and security agreements in furtherance of the

---

[1] This statement of facts is derived from the parties' submissions to the extent that those submissions are supported by uncontested evidence.

2008 Loan and Security Agreement. In order to maintain and perfect its lien position of this pledged collateral, on March 28, 2013, the United States filed a UCC Financing Statement Amendment documenting the continuation of initial financing statement No. 2008060901101.

In August of 2015, the Wellers executed a security agreement in favor of the United States which gave the United States a security interest in certain collateral of the Wellers, including, *inter alia*, crops, farming equipment, livestock, and farm-related accounts, and contracts possessed or later acquired by the Wellers. This 2015 Security Agreement specifically identified the crops grown on the farm of Joseph Forrest as part of the collateral pledged to secure this indebtedness. In order to maintain and perfect its lien position, in May of 2018, the USDA filed a UCC Financing Statement Amendment documenting the continuation of initial financing statement file No. 2008060901101. The USDA at this time also filed a UCC Financing Statement Amendment documenting party information change to identify James Weller and his then spouse, Natalie Weller, as debtors to initial financing statement No. 2008060901101. The Wellers defaulted under the loan and, as of March 11, 2019, the unpaid loan balance was $50,165.13.

## 2. <u>Weller's Business Relationship with Joseph Forrest</u>

From approximately 2005 through 2018, Joseph Forrest owned a 114-acre farm located at 9027 Groninger Valley Road, Port Royal, Pennsylvania. In February of 2009, Forrest, as landlord, entered into a lease with James Shenk and James Weller, individually and trading as Jimray Farms, for the fields and farm buildings at 9027 Groninger Valley Road, Port Royal, Pennsylvania 17082. Under the terms of the Lease Agreement, rent was due on the 1st of each month. The Lease Agreement provided, in part, the following regarding default and termination:

> Tenants shall be in default under the terms of this Lease if the rent is not paid on time, if their practices are such as to cause the organic certification of the farm to be questioned or removed, or if they violate any of the other covenants of this Lease. Landlord shall give Tenants five (5) days' notice of any such default, after which this Lease shall terminate and the Landlord shall be entitled to possession of the leased premises.

In April of 2011, Forrest, James Weller and Natalie Weller executed a second lease addendum that superseded a prior addendum and continued the original lease for a ten-year period from April 25, 2011, until April 25, 2021. The Wellers leased Forrest's property for farming operations which included the growing of corn. Eleven months later, on March 10, 2012, Forrest and the Wellers executed a third lease addendum. This lease addendum increased the

monthly lease to $2,800.00 but did not otherwise alter the remedies set forth in the original lease in the event of a default.

According to Mr. Forrest, the last rent payment he received under the lease was on July 1, 2017. Given this default, on August 22, 2017, Forrest posted an eviction notice on the milk parlor door at the Farm. The notice, styled as a "Notice to Remove" stated:

> You are hereby notified to quit, remove, and deliver up possession on or before 5 days from the day of service hereon. The premises consisting of: 9027 Groninger Valley Rd Port Royal PA 17082 Turbett Township Juniata County, Pennsylvania. I desire all damages paid and all rents paid to date as I desire to repossess the same.

Forrest also filed a landlord-tenant complaint against the Wellers in Pennsylvania Magisterial District Court 41-3-02. A hearing in this case was originally scheduled for October 17, 2017, but was continued. The magisterial district court docket indicates that the matter was then stayed on November 28, 2017, after notice that the Wellers filed bankruptcy. For their part, the Wellers vacated the property prior to any court-ordered eviction and Forrest ultimately did not obtain any court order or judgment against the Wellers.

As a result of these defaults by the Wellers, in addition to this eviction action Mr. Forrest indicated in his deposition that in July and August of 2017,

he filed UCC liens against the Wellers which encompassed all of their assets

including the crops they were growing on this leased property.

### 3.  The Disposition of the Grain Grown  By the Wellers.

At the time the Wellers vacated the property, they left approximately

50 acres of unharvested corn growing on Forrest's land. Over the next six

months Forrest disposed of some of this grain which had been pledged as

collateral on the USDA loan by harvesting and selling the grain.

The disposition of this corn is largely undisputed. It is also largely

uncontested that Forrest took the lead in disposing of this collateral, arranging

for the harvesting and sale of the corn. Further, it is clear that Forrest acted

knowing that USDA claimed that it had a security interest in the corn. Finally,

it is uncontested that, while the USDA offered Forrest and equitable  50-50

disposition of the proceeds from the sale of this corn, Forrest retained all of

the moneys obtained through the harvesting of the crops pledged to secure the

USDA loan.

This course of conduct commenced on 12, 2017, and October 16, 2017,

when USDA notified Forrest that it believed it possessed a valid, first-position

lien interest in the corn crops growing the Weller farm. On October 25, 2017,

Raymond P. Schaffer, a USDA Farm Loan Specialist, sent Forrest a letter

indicating that USDA had a lien filed against the Weller crops on Forrest's

land. However, USDA proposed that it would agree to a 50-50 split of the proceeds from the sale of this corn if Forrest provided proof that the rent arrearage exceeded 50% of the payment. In addition, USDA indicated that, if Forrest demonstrated a superior legal claim to 100% of these proceeds, the government would consent to his retention of all grain sale proceeds. In November of 2017, the USDA continued to put Forrest on notice of its position regarding its priority lien status with respect to these crops. On November 1, 2017, James F. Radintz, Deputy Administrator for USDA's Farm Loan Programs, sent a letter to Forrest explaining the agency's view that Forrest had not perfected any landlord's lien to establish a senior lien position over USDA.

In the face of these notifications from USDA, Forrest concedes that he took no further action to perfect his liens because he believed that he already held a superior lien position. Instead, on November 9 and 10, 2017, Forrest arranged for the harvest of approximately 20 acres of corn from the farm. Forrest then sold approximately 3,629 bushels of high moisture corn obtained from this harvest to Tuscarora Processors, which charged Forrest $2,012.63 for drying the harvested corn. As a result of this harvest, the net payment to Forrest was $7,829.04.

As these events transpired, USDA continued to place Forrest on notice of its lien position, while endeavoring unsuccessfully to arrange of compromise disposition of the grain. Specifically, on November 21, 2017, USDA sent Forrest a letter indicating that it had a UCC-1 and Security Agreement with James R. Weller that included crops grown on the property. However, USDA proposed that the proceeds from the harvest and sale of the commodity to be paid for the harvest costs, 50% payment of residual to Forrest, not to exceed one year of rent, and then 50% of payment of residual to USDA. There is no indication that Forrest agreed to this disposition or paid 50% of these proceeds to USDA.

Instead, in January 2018, Forrest arranged for an additional harvest of corn from this property. Forrest sold 4,712.6 bushels of high moisture corn to Geissinger Brothers, which charged Forrest $1,268.43 for drying the corn. The net payment to Forrest from Geissinger was $16,639.45. Once again, acting on his belief that he held a superior lien position, Forrest did not transmit any proceeds from this sale of the corn to USDA.

Forrest did not harvest any of the remaining crops. Instead, several months later, in May of 2018, Forrest leased the farm to Glen Henry, who plowed in the remaining standing corn.

In January 2018, FSA completed a chattel appraisal for this grain. In that appraisal it was estimated that the total Weller crop on the 50 acres of standing corn would yield of 200 bushels per acre and at a value of $3.40 per bushel. Based upon these estimates, the appraisal concluded that the total value of all of the grain was $34,000.00.

## III.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The plaintiff has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient

evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. V. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most

14

favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.,</u> 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.,</u> 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA,</u> 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne,</u> 676 F.2d 965, 968 (3d Cir. 1982); <u>see</u> <u>Sunshine Books, Ltd. V. Temple University,</u> 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine,</u> 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy,</u> 762 F.2d 338, 341 (3d Cir. 1985)

(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

### B. Forrest is Liable for Conversion

This is an action for conversion of collateral brought by the USDA. "Conversion is defined as the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." Spector Gadon & Rosen, P.C. v. Rudinski, Orso & Lynch, 2020 PA Super 91, 231 A.3d 923, 925 (2020). In this case, it is beyond dispute that USDA had some property interest in the crops pledged as collateral to secure its loan. Further, it is uncontested that Forrest's sale of those crops interfered with USDA's property interests. Additionally, there is no question that Forrest acted without the consent of USDA when he sold this grain and retained the full proceeds of the sale. Therefore, the only remaining, and potentially disputed, issue is whether Forrest's sale of this grain and retention of the sale proceeds was done "without lawful justification."

With respect to the question of whether a party acted without lawful justification, it is important to  note that "[a]lthough the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong." McKeeman v. Corestates Bank, N.A., 2000 PA Super 117, 751 A.2d 655, 659  n. 3 (2000). Therefore, Forrest's subjective beliefs regarding the lawfulness or unlawfulness of his conduct are irrelevant to this claim. One who acts upon a mistaken but sincere belief that he has a superior lien possession may still be liable for conversion. Simply put, regardless of intent a creditor who violates priority rules, liquidating assets in which it holds a subordinate interest, may be liable to a party with a superior perfected interest.

Therefore, the issue of whether Forrest was lawfully justified in selling these crops which were pledged to secure the USDA loan turns on the priority of the parties' respective security interests. If Forrest held a priority lienholder position superior to that of the USDA, then he was lawfully justified in following this course and this conversion claim fails; conversely, if USDA's liens were superior to those of Forrest, then his actions were undertaken without lawful justification and the USDA had made out its conversion claim.

In this case we are called upon to determine the priority of liens between two rival claimants to agricultural products; namely, harvested crops. On this

18

score it is well settled that: "While farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection and the priority of an agricultural lien on the farm products." 13 Pa. Cons. Stat. § 9302. Since these crops were located in Pennsylvania, Pennsylvania's interpretation of the Uniform Commercial Code governs this dispute.

With respect to determining the priority of perfected liens, "[g]enerally, liens receive priority according to the 'first in time is first is right' rule." Augello v. United States, No. CIV. A. 1:92-CV-697, 1993 WL 330472, at *5 (M.D. Pa. June 4, 1993). With few exceptions, this rule of temporal proximity is explicitly part of the law of Pennsylvania. "In Pennsylvania, liens generally are prioritized based on the order in which they are recorded, *i.e.*, first in time, first in right." Foxfield at Naaman's Creek Homeowner's Ass'n v. Eventoff, 2024 PA Super 316, 329 A.3d 1271, 1277 (2024).

However, in order to obtain a superior lien position based upon temporal priority a creditor's lien must both attach to collateral and be perfected. As this court has previously explained:

> Among the most important concepts in the U.C.C. secured transactions system are "attachment" and "perfection." 4 White & Summers, *supra,* § 31–1. By attaching certain assets of the debtor, the creditor gains a security interest in those assets that may be enforced against the debtor in the event of default. 13 Pa.

Cons.Stat. §§ 9203, 9601 (2002); id. §§ 9203, 9504–9505 (1999). Only through attachment may a creditor gain the right to collect and liquidate specific assets of the debtor. Id. §§ 9203, 9601 (2002); id. §§ 9203, 9504–9505 (1999); 4 White & Summers, *supra,* §§ 34–1, 34–5. Attachment generally requires execution of a "security agreement" that reasonably identifies the assets offered by the debtor as collateral for the extension of credit. 13 Pa. Cons.Stat. §§ 9108, 9203 (2002); id. §§ 9110, 9203 (1999).

Closely related to attachment is "perfection." See 4 White & Summers, *supra,* § 31–1. By perfecting an interest, the creditor is entitled to take "priority" in the collection and liquidation of the assets of the defaulting debtor as against other creditors with unperfected security interests in the same collateral. 13 Pa. Cons.Stat. §§ 9317, 9322 (2002); id. §§ 9301, 9312 (1999); 4 White & Summers, *supra,* §§ 31–1, 37–1. A creditor that violates priority rules, liquidating assets in which it holds a subordinate interest, may be liable to a party with a superior perfected interest. See Chrysler Credit Corp. v. Smith, 434 Pa.Super. 429, 643 A.2d 1098, 1102 (1994), cited in In re Varsity Sodding Serv., 139 F.3d 154, 156 (3d Cir.1998); see also 13 Pa. Cons.Stat. §§ 9317, 9322 (2002); id. §§ 9301, 9312 (1999); 4 White & Summers, *supra,* §§ 31–1, 37–1. Perfection requires (1) attachment and (2) the filing of a financing statement with state and local government offices indicating the debtor, the secured party, and the collateral attached. 13 Pa. Cons.Stat. §§ 9308(a), 9310(a), 9502 (2002); id. §§ 9302, 9303(a), 9402 (1999). The steps may be completed in any order, meaning that a party may file a financing statement covering collateral before the party gains a security interest in the assets, but the interest will be perfected only when both requisites are satisfied. Id. §§ 9308(a), 9310(a), 9502 (2002); id. §§ 9302, 9303(a), 9402 (1999); Credit Alliance Corp. v. Jebco Coal Co., 688 F.2d 10, 13 (3d Cir.1982); Heights v. Citizens Nat'l Bank, 463 Pa. 48, 342 A.2d 738, 742–45 (1975); 4 White & Summers, *supra,* §§ 31–1, 37–1.

When two or more parties hold perfected security interests in the same collateral, priority is determined according to the dates of filing of the parties' respective financing statements. 13 Pa.

20

Cons.Stat. § 9322(a)(1) (2002); id. § 9312(e)(1) (1999); see also
Credit Alliance, 688 F.2d at 13; Heights, 342 A.2d at 742–45.

Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d
230, 237 (M.D. Pa. 2004) (footnotes omitted).

Guided by these legal tenets, in the instant case we find that the USDA
lien enjoyed first-in-time priority. As early as 2008 and continuing through
2015, Weller pledged crops, including corps to be grown in the future, as
collateral to security the USDA loan. By 2015 Weller specifically included
the crops which he was planting on the lands leased from Forrest at collateral
securing this loan. Further, USDA continuously maintained this lien position
through timely UCC filings up through 2018. Thus, this security interest
"attached" to this grain long before the Wellers defaulted on their lease, or
Forrest endeavored to assert his own liens in the Summer of 2017. Moreover,
the fact that the precise crops at issue here came into being after the initial
execution of these security agreements is a matter of no moment. "A perfected
interest covering 'after-acquired' property attached to that property instantly
when the debtor acquired rights in that property, . . .; and the secured creditor
continued to have a superior interest in that property over intervening
judgment creditors who attempted execution after his original UCC filing."
Klingner v. Pocono Int'l Raceway, Inc., 289 Pa. Super. 484, 488–89, 433 A.2d

21

1357, 1360 (1981).

Further, it appears that USDA perfected its security interest in a timely fashion. As we have noted, perfection of a security interest requires (1) attachment and (2) the timely filing of a financing statement with state and local government offices indicating the debtor, the secured party, and the collateral attached. 13 Pa. Cons.Stat. §§ 9308(a), 9310(a), 9502. Both of these requisites appear to have been met by USDA prior to 2017. Therefore, it seems that USDA enjoyed a first-in-time perfected security interest in this collateral.

For his part, Forrest attempts to defeat the USDA's conversion claim and avoid the temporal superiority of its lien on these crops by arguing that as a landlord he enjoyed a super priority upon these assets by virtue of a landlord lien for unpaid rent. However, in our view this claim also fails.

To be sure, under Pennsylvania law in certain circumstances a landlord may obtain a superior lien position by following statutory distraint procedures. The landlord distraint process is:

> [G]overned by Pennsylvania's Landlord and Tenant Act of 1951. 68 Pa.Stat.Ann. §§ 250.302 *et seq.* (Purdon 1987) The statute sets forth the self help procedure a landlord must follow in order to take possession of and sell a tenant's personal property found at the leased premises for rentals in arrears. Once the landlord determines the rent is in arrears, the landlord may then subject any of the tenant's personal property (which is not exempt under

22

§ 250.401 *et seq.*) to "distress for any rent reserved and due." 68 Pa.Stat.Ann. § 250.302 (Purdon 1987).

The landlord may distrain without giving the tenant prior notice and distraint can be accomplished by either taking possession of the property or by posting a notice of distraint. The notice of distraint must state the amount of rent in arrears and a list of the property levied upon together with the date of such levy. The tenant must be given this notice within five days after making the "distress." Id. If the tenant or owner of the personal property distrained does not institute a replevin action within five days of receiving notice of the distraint, the landlord *may* proceed to have the goods appraised. 68 Pa.Stat.Ann. § 250.308 (Purdon 1987). Once the goods are appraised and after six days' notice, the distrained property may be sold to satisfy the arrearages. 68 Pa.Stat.Ann. § 250.309. (Purdon 1987).

In re Kelco Enters., 86 B.R. 471, 473–74 (Bankr. W.D. Pa. 1988) (footnotes omitted).

However, it is also well-settled that full procedural compliance with this distraint process set by law is a prerequisite to the assertion of any super priority landlord lien. As one court has explained:

This comprehensive distraint procedure is further augmented by two other provisions [of Pennsylvania law]. Sections 321 and 322 of the Landlord and Tenant Act grant the landlord a priority lien on property which is properly distrained if the property is subsequently executed upon by another creditor or if the tenant files a petition in bankruptcy. The landlord is granted priority even over a prior perfected security interest. See In re Einhorn Brothers, 272 F.2d 434 (3d Cir.1960). However, the landlord has no valid lien prior to distraint. In re Uni–Lab, Inc., 282 F.2d 123 (3d Cir.1960). Thus, under Pennsylvania's statutory scheme, a landlord must first comply with the comprehensive distraint procedures before a lien arises and can be enforced

23

Id., at 474.

In this case, it is clear that Forrest did not complete all of the procedural requirements of the distraint process, the legal prerequisite to the assertion of a landlord lien. In the absence of full compliance with Pennsylvania's landlord distraint laws, Forrest cannot avail himself of the safe harbor of a super priority landlord lien. This argument fails.

Likewise, Forrest cannot defeat the USDA lien by arguing that this agency agreed to compromise its lien position in a fashion which entitled him to retain the full proceeds of these sales. While it is clear that USDA offered on a number of occasions to compromise its lien in favor of a 50-50 division of proceeds from the sale of these crops, Forrest's contractual defense to this lien fails for a single, simple reason: Forrest never abided by the terms of this proposed agreement by sharing the proceeds of the sale of this grain with USDA. Nor did Forrest demonstrate a legal entitlement to retain the full amount of these proceeds. Simply put, Forrest did not live up to his part of the bargain proposed by USDA. Therefore, he may not assert that USDA proposal, which he repudiated, as grounds to defeat this agency's lawful, priority lien.

Finding that USDA held a priority lien position on these crops which

were harvested and sold by Forrest, and mindful that a creditor who violates priority rules, liquidating assets in which it holds a subordinate interest, may be liable to a party with a superior perfected interest, we find that the plaintiff is entitled to summary judgment in its favor on this conversion claim.

### C. **The Plaintiff is Entitled to Recover $24,468.49 in Damages**.

Finally, we conclude that the uncontested evidence enables us to define the value of the grain converted and, hence, the amount of damages in this case as a matter of law. The undisputed facts reveal that between November 2017 and January 2018 Forrest twice caused corn pledged as collateral on this USDA loan to be harvested and sold. In these two transactions Forrest first collected $7,829.04 and later received net proceeds of $16,639.45. Thus, the total amounts obtained by Forrest through these two acts of conversion was $24,468.49. In our view this is the amount of damages that the United States has proven it can recover as a matter of law on its conversion claim.

While the government has asserted a claim to an additional $5,638.56 in damages based upon an extrapolation of the value of unharvested corn left in the fields, we regard this claim as too speculative and mired in controversy to be sustained on summary judgment. In particular, questions remain regarding whether and to what extent unharvested grain remained in the fields as well as whose fault it was that this grain was not fully harvested. Further,

in our view it cannot be said that Forrest converted this grain merely by failing to harvest it. On this score, we note that in Pennsylvania a successful conversion claim typically requires proof of some positive wrongful act by the defendant, an affirmative act which is notably lacking in this case with respect to the unharvested grain. See W. Min. Corp. v. Standard Terminals, Inc., 577 F. Supp. 847, 851 (W.D. Pa.), aff'd, 745 F.2d 49 (3d Cir. 1984).

Having reached these conclusions an appropriate order follows.


                                        S/ Martin C. Carlson
                                        Martin C. Carlson
                                        United States Magistrate Judge


DATED: July 11, 2025

26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CIVIL NO. 1:19-CV-564** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **JOSEPH FORREST,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

Accordingly, for the reasons set forth in the accompanying Memorandum Opinion, IT IS ORDERED as Follows:

First, the plaintiff's motion for summary judgment (Doc. 104) is GRANTED.

Second, judgment is entered in favor of the plaintiff on the conversion claim set forth in the complaint in the amount of $24,468.49.

Finally, the clerk is directed to CLOSE this case.

So ordered this 11th day of July 2025.

> *S/ Martin C. Carlson*
> Martin C. Carlson
> United States Magistrate Judge